**SO ORDERED.**

**SIGNED this 17th day of January, 2014.**





Robert E. Nugent
United States Chief Bankruptcy Judge

OPINION DESIGNATED FOR ONLINE PUBLICATION
BUT NOT PRINT PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

IN RE: )
)
BRENDA KAY HILDYARD, )  Case No. 12-13337
) Chapter 13
Debtor. )
_____ )

**ORDER (1) OVERRULING DEBTOR'S OBJECTION TO WESTERN STATE BANK'S CLAIM; (2) DENYING WESTERN STATE BANK'S MOTION FOR STAY RELIEF; AND (3) CONDITIONING THE CONTINUATION OF THE AUTOMATIC STAY**

Brenda Hildyard objects to the claim filed in this case by Western State Bank.[1] She also objects to the Bank's motion for stay relief.[2] Her claim objection contains two contentions: (1) that the Bank's deed of trust on her home in Colorado only secures

---

[1] Dkt. 74, 146.
[2] Dkt. 56.

1

the repayment of one of two separate promissory notes; and (2) that she has an equitable right to direct how the Bank should have applied the proceeds of a term life insurance policy her late husband assigned as collateral on his debts to the Bank.

Whether the Bank's deed of trust secures more than one note turns on whether it contains a "future advance" clause and whether the notes it is supposed to secure either (a) reference the mortgage as part of their collateral; or (b) are of a similar kind or character as the note or notes to which the mortgage or deed of trust of trust specifically refers. These principles are clearly established in Kansas by a combination of case law and statutory references; they are similarly clear under Colorado law. Here, Brenda Hildyard executed a deed of trust (DOT) covering a home in Colorado.[3] The DOT states that it was given to secure "a promissory note or notes" dated July 16, 2009 in an amount in excess of $175,000 and an additionally typed-in term provides that the DOT was given "to secure all present and future indebtedness of the undersigned as set forth on separate page attached hereto as Exhibit B." But there was no Exhibit B, opening to question the extent to which the DOT secures notes other than the one made on July 16. After careful consideration of the language of the DOT as well as the loan agreements and notes that were executed contemporaneously and afterwards, I conclude that the deed of trust on the Colorado property adequately references future debt and therefore secures both promissory notes.

---

[3] Ex. 8.

As to her second contention, Brenda asserts that she should have been given the opportunity to direct the manner in which her husband's life insurance proceeds were applied to the Bank's claims. But, the terms of the collateral assignment expressly grant the Bank the right to apply the proceeds as it deems fit.[4] Moreover, Brenda made no attempt to direct their application and, as a matter of common law, when no directions are given, a creditor is free to apply payments to multiple debts of the debtor in any order.

The final question here is how to resolve the Bank's motion for stay relief. The Bank only sought relief to enforce its liens on a condominium on Hill Street in Colby, Kansas (the Hill Street Condo), and a home in Broomfield, Colorado (the Broomfield Property).[5] After the Bank filed its motion, Brenda sold the Hill Street Condo free and clear of liens under 11 U.S.C. § 363(f).[6] The stay may be lifted for lack of adequate protection or if the debtor lacks equity in the property and it is unnecessary to an effective reorganization. While the Bank showed that Brenda lacks equity in the Broomfield Property, that property is necessary to an effective reorganization. Brenda has made provisions to adequately protect the Bank's interest in that property. The continuation of the stay as to that property may be conditioned upon the Bank being required to realize upon its other available security before foreclosing upon and selling the Broomfield Property so long as Brenda adequately protects the

---

[4] Ex. 11, ¶ I.
[5] Dkt. 53.
[6] *See* Dkt. 76 and 103. The Bank consented to the sale of the condo.

3

Bank's interest by paying property taxes and debt service on the senior liens and proposes a chapter 13 plan that contains a confirmable treatment of the Bank's claim.

*Jurisdiction*

Motions for stay relief and objections to claims are core proceedings under 28 U.S.C. § 157(b)(2)(B) and (G), for which this Court may exercise subject matter jurisdiction.[7]

**Facts**

Brenda Hildyard filed this chapter 13 case on December 12, 2012. According to her petition and schedules, she resides at 1005 W. 7th Street in Colby, Kansas and claims the 7th Street property exempt as her homestead.[8] She was married for 32 years to Dr. Victor Hildyard, a physician in Colby. He died in July of 2012. Victor's practice was organized in partnership with Dr. Ladonna Regier as Colby Medical & Surgery Center (CMS). He also operated Medical Arts, Inc., another health care provider. The Bank had long been one of Dr. Hildyard's lenders. By February of 2008, the medical entities, Dr. Regier, and he personally owed the Bank over $1.476 million secured by the entities' and personal assets. When Victor, Regier, and the entities defaulted on their debt, the Bank foreclosed.[9] In an effort to resolve that case and to preserve what they could of Victor's practice, Victor, Brenda, and Dr. Regier entered into workout agreements with the Bank, beginning in June of 2009. Regier left the

---

[7] *See* 28 U.S.C. § 157(b)(1) and § 1334.
[8] Dkt. 33. The Bank claims no interest in the 7th Street property. Under Brenda's current proposed plan, she proposes to sell her homestead, secured to Sunflower Bank, and reinvest the equity in a future homestead – at trial identified as the Broomfield Property. Dkt. 35.
[9] Ex. B, Foreclosure Petition filed April 16, 2009 in the District Court of Thomas County, Kansas. Brenda was not a party to the foreclosure action.

4

partnership and made her separate peace with the Bank, agreeing on June 26, 2009 to pay it $140,000 cash in full satisfaction of its claims against her.[10] Victor did not consent to this agreement and, specifically, to the Bank releasing her. On July 16, Medical Arts, CMS, Victor, and Brenda signed the first of two workout agreements with the Bank.[11] By this time, Regier had left the CMS partnership. Brenda was not personally liable for any of Victor's individual or business debts, though she was personally liable on a $35,000 note that was secured to the Bank by a mortgage on the couple's Hill Street Condo. Nothing in the July 16 agreement referred to that debt; nor was it included in the Bank's foreclosure action.

The July 16 agreement provided for the entities and Hildyard to make two notes to pay the remaining balance of the February 2008 obligation after Dr. Regier's $140,000 was applied and to provide additional collateral to secure the debt.[12] Note 1 was to be for $960,000, bearing interest at 5.25% and payable in 60 monthly instalments of $6,000 with a balloon payment for the remaining balance due thirty days after the 60th monthly payment. Note 2 was in the amount of $498,174.17, due on demand at any time after 60 months from its making or upon any default under Note 1. As partial security for the repayment of these obligations, Victor agreed to assign a $500,000 term life insurance policy owned by Medical Arts. Regier agreed to assign a similar insurance policy, also owned by Medical Arts (though Regier did not

---

[10] Ex. D. The Bank also retained a 2008 assignment of life insurance on the life of Dr. Regier.
[11] Ex. 1, Loan Agreement of July 16, 2009 and Ex. 3, Loan Agreement of September 1, 2009.
[12] Ex. 1.

5

sign this workout agreement or a later one).[13] The debtors all agreed that the Bank's liens under any pre-existing security agreements and mortgages would continue to secure its claims.[14] In addition, Victor and Brenda agreed "to execute a Deed of Trust granting the Lender a third lien in the amount of $175,000 on their Colorado home . . ." in Broomfield, Colorado.[15] The Bank would accept these two notes as full payment of the February, 2008 note and, if the monthly payments on Note 1 were timely paid, Note 2 would be forgiven after 60 months.

The Hildyards signed the deed of trust on the Broomfield Property on July 16, 2009.[16] Victor signed Note 2 on that date, both for himself and for his entities.[17] For reasons that are not clear in the record, Note 1 was not signed that day, inadvertently creating an issue about the intent of the parties with respect to what the DOT was intended to secure. On September 1, 2009, the same parties signed another loan agreement that was substantially identical to the July loan agreement, except that the amount of Note 1 had increased to $1.102 million and monthly payments increased to $7,000.[18] On the same date, Victor signed the revised Note 1 for himself

---

[13] *Id.* at ¶ 2. *See* Ex. 10, Security Agreement dated July 16, 2009 executed by Victor for Medical Arts, Inc. describing the insurance assignments as collateral. It appears that the life insurance assignments had been previously given by Drs. Regier and Hildyard in October 2008. *See e.g.* Ex. 11. The Court construes the workout agreements as acknowledging the assignments would continue to secure Victor's debt, Notes 1 and 2.

[14] Ex. 1, ¶ 4.

[15] *Id.* at ¶ 3. The DOT executed by the Hildyards is somewhat clumsily worded "for the principal sum of in excess of One Hundred Seventy Five Thousand . . ." referring to the promissory notes dated July 16, 2009. The Court acknowledges that Note 2 dated July 16, 2009 is in excess of $175,000 and interprets the DOT to be limited to the amount of $175,000. *See* Ex. 8.

[16] Ex. 8. It was recorded on August 10, 2009.

[17] Ex. 2.

[18] Ex. 3.

6

and his entities.[19] Note 1 is identical in form to Note 2. Brenda did not sign either note. The collateral description in both Note 1 and Note 2 specifically describes a "3rd DOT dated 7-16-09."

The parties agree that when Note 1 was finally signed in September, both it and Note 2 were secured by the three commercial mortgages covering commercial property in Colby, along with a security agreements dated February 27, 2002, another dated July 16, 2009, and collateral assignments of the Hildyard and Regier insurance policies. The parties also agree that Note 2, signed on July 16, 2009, was secured by the DOT. Brenda Hildyard disputes that the DOT secures Note 1. That is the thrust of her objection to the Bank's claim.

Dr. Hildyard lost his admitting privileges at the Colby hospital, severely curtailing his practice and income. In October of 2011, he and Brenda filed a chapter 11 case in Topeka after he failed to comply with the terms of the two workout agreements.[20] Then, Dr. Hildyard became gravely ill and was unable to complete the chapter 11. That case was dismissed on May 25, 2012. In July of 2012, Dr. Hildyard died intestate. Brenda is his only heir and is the administratrix of his probate estate. The Bank realized on the life insurance policy on his life and applied the $500,000 it received to Note 1. It continues to pay the premiums on the Regier policy. Victor's estate remains in probate in Thomas County District Court. After Brenda filed this chapter 13 in December of 2012, she proposed a plan under which Victor's property

---

[19] Ex. 4.
[20] Case No. 11-41646 (Bankr. D. Kan.).

7

would be sold in this case under §363 or in the probate proceedings. The Court has approved her motion to sell the Hill Street Condo. She intends to move to Colorado and live in the Broomfield Property at some point in the future after selling her current homestead at 1005 West 7th Street in Colby. The Broomfield Property is encumbered by three DOTs, the first and second in priority being in favor of Wells Fargo. The Bank's deed of trust is third. There are several Notices of Federal Tax Lien of record against the Broomfield Property as well, but they are junior in priority to the lenders' deeds of trust.

Brenda objects to the Bank's secured claim, specifically contending that the DOT does not secure Note 1 and further arguing that she was entitled to direct the Bank to apply the $500,000 life insurance benefit to pay off Note 2, which she believes would render the Broomfield house free and clear of the Bank's liens. Pursuant to an adequate protection agreement that is outlined in an agreed Scheduling Order filed in this case, Brenda has agreed to maintain current both the property taxes on the Broomfield home as well as debt service on the two senior liens.[21]

Both Brenda's objection to claim and the Bank's motion for relief from the stay were tried on October 22, 2013.[22] Confirmation of her chapter 13 plan was deferred until the claim objection could be determined.

***Brenda's Objections to the Bank's Claim***

---

[21] Dkt. 106.
[22] The debtor Brenda Hildyard appeared in person and by her attorney Elizabeth A. Carson. Creditor Western State Bank appeared by its attorney Justin Whitney. The chapter 13 trustee Laurie B. Williams appeared in person.

**The Deed of Trust on the Broomfield Property Secures Both Notes**.

Both Notes 1 and 2 are on an identical printed form that reference the July 16, 2009 DOT under the section titled "Collateral Description." Both Notes also contain a printed clause that reads:

> Collateral. This Note is secured by real property and the debt evidence by this Note and all other obligations of Debtor to Lender . . . are secured by all collateral securing this Note and by all other security interests and mortgages previously or later granted to Lender as more specifically described [in those documents] . . . .[23]

The Deed of Trust is not so straightforward. It provides that Victor and Brenda "executed a promissory note or notes hereinafter referred to in the singular, dated July 16, 2009, for the principal sum of in excess of One Hundred Seventy Five thousand and no/100- Dollars . . . ."[24] Victor signed the notes for himself and his entities. He executed Note 2 and the DOT on July 16, 2009, but did not sign Note 1 until September. Nowhere in the printed language of the DOT is there a future advance provision. But someone typed verbiage into a blank area on page 2 that reads—

> This mortgage is made to secure all present and future indebtedness of the undersigned as set forth on separate page attached hereto as Exhibit B and made a part hereof by reference."[25]

This language was inserted in a space left for the notation of any exceptions to the grantors' covenant of title. The Bank concedes that there is no Exhibit B. This document's absence further fuels Brenda's objection to the reach of the DOT lien.

---

[23] Ex. 2 and 4.
[24] Ex. 8.
[25] *Id*.

9

Brenda testified that she did not intend to be personally liable for any of Victor's debts, including those incurred or restated under the Loan Agreements. But she admits signing the agreements, both of which clearly contemplate that all of the collateral described in them would secure both Notes. The Loan Agreements express the purpose of renegotiation of the 2008 loan so that "the Lender can receive *additional collateral* to secure the debt."[26] The July 16, 2009 DOT is the additional collateral and is expressly agreed to by Victor and Brenda in the Loan Agreements.[27]

The Bank's DOT secures the repayment of Note 1 if the DOT, by its terms, secures future advances and Note 1 references it, or if Note 1 evidences an obligation of similar character to Note 2. The parties assume that Kansas law governs here. The Loan Agreements, Notes and the DOT were all executed in Kansas, but because title to Colorado property is affected, we should consider which state's law applies in interpreting the DOT. As explained below, I reach the same conclusion whether Kansas or Colorado law is applied.

Federal courts apply the choice of law principles employed by the courts of the state in which they sit when adjudicating state law issues.[28] The meaning of the Loan Agreements, Notes, and DOT implicate state law issues; they are contracts between the parties and the rules of construction applicable to contracts apply.[29] Kansas state

---

[26] Ex. 1 and 3.
[27] *Id.* at ¶ 3.
[28] *Dang v. UNUM Life Ins. Co. of America,* 175 F.3d 1186, 1190 (10th Cir. 1999); *In re Patterson,* 375 B.R. 652, (Bankr. D. Kan. 2007) (While dischargeability of debt is a bankruptcy issue, whether debt was owed was a state law issue requiring Kansas bankruptcy court to apply Kansas choice of law principles.).
[29] *Mark Twain Kansas City Bank v. Cates,* 248 Kan. 700, 709-10, 810 P.2d 1154 (1991).

courts traditionally apply choice of law principles as reflected in the original Restatement of Conflict of Laws.[30] Section 8(1) of the original Restatement provides that "all questions of title to land are decided in accordance with the law of the state where the land is, including the Conflict of Laws rules of that state."[31] Consistent with § 8(1) and specific to mortgages, the Restatement (Second) of Conflict of Laws, § 228(1) provides that "whether a mortgage creates an interest in land and the nature of the interest created are determined by the law that would be applied by the courts of the situs." But Kansas also recognizes in the Restatement (Second) an exception to this choice of law rule if there is an enforceable choice of law provision in the documents.[32] In *Mark Twain Kansas City Bank v. Cates,* the Kansas Supreme Court applied Missouri law to determine whether a future advance clause in a mortgage on Kansas property secured the lender's loan, citing § 187 of the Restatement (Second) and reasoning:

> It is not unusual for commercial transactions to traverse state lines. Although the Uniform Commercial Code . . . does not apply to mortgages, it does state our legislature's intent that territorial restrictions should not hinder commerce. . . . when a transaction bears a reasonable relation to Kansas and also to another state, the parties are allowed to contract that the laws of Kansas or the other state will govern the rights and the duties of the parties. K.S.A. 84-1-

---

[30] *See Raskin v. Allison*, 30 Kan. App. 2d 1240, 1242, 57 P.3d 30 (2002).
[31] Restatement (First) of Conflict of Laws § 8 (1934); *see also,* Restatement (Second) of Conflict of Laws §§ 223 and 228 (1969).
[32] *See* Restatement (Second) of Conflict of Laws, § 187 (1969) (law of the state chosen by the parties to govern their contractual rights and duties); *Mark Twain Kansas City Bank v. Cates,* 248 Kan. 700, 705-07, 810 P.2d 1154 (1991) (applying Missouri law to a mortgage executed in Missouri on Kansas property where the mortgage contained a Missouri choice of law provision to determine whether the bank's loan was secured by the future advance clause of the mortgage).

11

105. The same public policy applies to a loan and mortgage executed in Missouri on land located in Kansas.[33]

In our case, the Loan Agreements contain a Kansas choice of law provision and are governed by Kansas law, even if one of the parties may in the future become a resident of another state.[34] The Notes also provide for application of Kansas law: **"ADDITIONAL PROVISIONS.** . . . (3) This Note *and the obligations evidenced by it* are to be construed and governed by the laws of the state indicated in Lender's address [Kansas] shown in this Note."[35] The DOT does not contain its own choice of law provision, but arguably, Kansas law governs it as well where the Note references the DOT, if it is considered an "obligation[ ] evidenced by" the Note. All of these documents [Loan Agreements, Notes, and DOT] were part of the same basic loan workout transaction in 2009 and must be considered together.[36] All of the documents were executed in Kansas. All the parties to the transaction were Kansas parties. Except for the Broomfield Property, all of the other property securing the loans is located in Kansas. Thus, the transaction bears a reasonable relation to Kansas and the parties' choice of Kansas law may apply.

Under Kansas law, future advance clauses or dragnet clauses in a real estate mortgage are permitted and enforceable.[37] In *First Nat'l Bank & Trust Co. v. Lygrisse* the Kansas Supreme Court stated that subsequent debts may be secured under the

---

[33] 248 Kan. 700, 706-07.
[34] Ex. 1 and 3, ¶ 10.
[35] Ex. 2 and 4 (Emphasis added).
[36] *Carpenter v. Riley,* 234 Kan. 758, 763, 675 P.2d 900 (1984).
[37] *See* KAN. STAT. ANN. § 58-2336 (2005); *Potwin State Bank v. Ward,* 183 Kan. 475, 491, 327 P.2d 1091 (1958).

12

dragnet clause of a real estate mortgage in one of two ways: (1) by specifically referencing the mortgage on the face of the new note that it is secured by the prior mortgage; or (2) by showing that the subsequent debt is of the same kind or character as, or part of the same transaction or series of transactions with, that originally secured by the mortgage.[38] Both of these methods for securing Note 1 are satisfied here. On the face of Note 1 dated September 1, 2009 the DOT is referenced in the collateral description as "3rd DOT DATED 7-16-09." There was no evidence presented at trial that more than one deed of trust on the Broomfield Property was executed on July 16, 2009 and it was undisputed that the Bank's DOT dated July 16, 2009 was in a third position behind Wells Fargo. Both Notes referenced the Bank's 3rd DOT of July 16, 2009 as securing the indebtedness.

Reading the "all present and future indebtedness" language in the context of the July and September Loan Agreements makes clear that both Notes were intended to be signed simultaneously and be secured by the DOT. Even though they weren't, it is also clear from the identical language of the Loan Agreements that the parties intended that all of the security granted or retained pursuant to those agreements, including the Broomfield Property DOT, would secure both Notes. If I consider all of the documents pertaining to the workout agreement together, as I must, I can readily conclude that the July and September 2009 Loan Agreements, Notes, and the DOT are all related and part of a series of transactions to effectuate the terms of the loan

---

[38] *First Nat'l Bank & Trust Co. v. Lygrisse*, 231 Kan. 595, Syl. ¶ 1, 647 P.2d 1268 (1982). *See also, Mark Twain Kansas City Bank v. Cates,* 248 Kan. at 712.

13

workout of Victor's defaulted 2008 loan. The Loan Agreements clearly contemplated renewal of the 2008 loan balance by dividing the principal balance between Notes 1 and 2. The principal amounts of those Notes correspond with the two Loan Agreements. The date of Note 2 corresponds with the July 16, 2009 Loan Agreement. The date of Note 1 corresponds to the September 1, 2009 revised Loan Agreement. Both Loan Agreements expressly recite Brenda's agreement to grant the Bank a third lien on the Broomfield Property in the amount of $175,000 by executing a DOT – additional collateral to secure the debt. The Loan Agreements did not limit the DOT to securing only Note 2. And while the typed-in clause in the DOT was somewhat incomplete by the omission of Exhibit B describing the "present and future indebtedness of the undersigned," there is little doubt from the Loan Agreements and the Notes that the parties intended the DOT to secure Victor's, Medical Arts, and CMS's present and future indebtedness, including the outstanding balance of Victor's 2008 defaulted note – to be allocated between Note 1 and Note 2. Reading these contracts together, Note 1 was part of the 2008 loan workout transaction and was secured by the DOT on the Broomfield Property.

Even if the choice of Kansas law designation is inapplicable or unenforceable and we default to Colorado law as the situs of the Broomfield Property subject to the DOT by applying Restatement (Second) of Conflict of Laws, § 228, the same result obtains. Colorado case law on future advance clauses is similar to Kansas law. "[A] trust deed or a mortgage given to secure payment of an indebtedness may include

advances to be made in the future."[39] In order for a debt to be secured by a deed of trust containing a dragnet clause, the parties must have intended the deed of trust to secure the debt at the time the deed of trust was executed.[40] The court should examine whether the parties reasonably contemplated the obligation at the time of the agreement.[41] As discussed and applied above, the facts and documents here readily demonstrate that the DOT was intended to secure both Note 1 and Note 2, that both Notes were contemplated by the workout agreement, and that Note 1, executed less than two months after Note 2, was related to Note 2 and was of the same nature. Accordingly, under Colorado law, Note 1 was secured by the DOT granted by Brenda.

Brenda had the burden to meet the presumed validity of the Bank's claim on this point and, had she succeeded in doing that, the burden of proof would have shifted to the Bank to demonstrate its claim's validity on the merits. She failed to present sufficient evidence to meet the presumption that the Bank's claim on this point is valid. This portion of her objection must be overruled.[42]

**The Bank Could Apply Victor's Life Insurance Proceeds to Any of His Debts.**

---

[39] *Kimmel v. Ratty*, 168 Colo. 431, 435, 451 P.2d 751, 753 (1969). *See also* COLO. REV. STAT. § 4-9-204(c) (2001) (Colorado version of UCC recognizing and allowing future advance and dragnet clauses).
[40] *Mohler v. Buena Vista Bank and Trust Co.*, 42 Colo. App. 4, 7, 588 P.2d 894 (1978) (deed of trust dragnet clause unenforceable where there was no evidence of intent to secure the collateral indebtedness).
[41] *In re Grizaffi,* 23 B.R. 137, 139 (Bankr. D. Colo. 1982) (construing dragnet clause in context of loans secured by personal property; intent cannot be inferred where the debt transaction is unrelated to the original financing or is not of the same nature).
[42] Fed. R. Bankr. P. 3007.

15

Brenda also claims that the Bank should have applied Victor's $500,000 death benefit to Note 2, instead of Note 1. If only Note 2 was secured by the deed of trust, and if the death benefit were first applied to that note, it would be paid in full and the Bank would be required to release the deed of trust.[43] Her second contention fails because Brenda offered no evidence that she attempted to direct the payment of the proceeds to one note or the other. Even if she had, the express terms of the insurance assignment allow the Bank to apply the benefit as it sees fit.

Longtime Kansas precedent holds that if a debtor owes a creditor more than one debt, in the absence of the debtor's directing the creditor to apply a payment to a particular debt, the creditor may apply the debt as it sees fit.[44] In addition, the insurance assignment expressly authorized the Bank to apply the proceeds of the policy to any of the liabilities it secured.[45] The Bank had a contractual right to apply the death benefit to Note 1, first to accrued interest, and then to reduce principal. Brenda again failed to meet the presumption of validity of this aspect of the Bank's claim and her second objection must be overruled.[46]

---

[43] The assignment of the insurance policy on Victor's life expressly provides that it is security "for any and all liabilities of the undersigned, or any of them, to [Western State Bank], either now existing or that may hereafter arise between [them] with respect to the above policy . . .". *See* Ex. 11, ¶ D. At the time of the assignment dated October 27, 2008, CMS, Medical Arts, and Victor were indebted to the Bank under the February 2008 Note.

[44] *Aetna Cas. and Surety Co. v. Hepler State Bank*, 6 Kan. App. 2d 543, 554-55, 630 P.2d 721 (1981).

[45] Ex. 11, ¶ I.

[46] Brenda raised a third contention at trial, that when the Bank entered into a separate agreement with Regier, that agreement released Victor. But Regier's release came prior to the Loan Agreements with Victor and Brenda and, in any event, both Notes contain clauses that provide for each maker to waive various suretyship defenses including the release of any other debtor. Victor therefore waived that defense.

**The Bank's Stay Relief Motion is Denied, but Continuation of the Stay is Conditioned.**

Western State Bank sought relief from the automatic stay to foreclose its interests in the Broomfield Property and the Hill Street Condo in Colby. Brenda has obtained an order approving the sale of the Hill Street Condo, with the Bank's consent.[47] This leaves the Broomfield Property. The Bank proceeds on both grounds under § 362(d), that it lacks adequate protection of its interests under (d)(1) and that Brenda lacks equity in the property and that it is not necessary to her effective reorganization under (d)(2). Brenda has agreed to pay the real estate taxes and the debt service on the senior liens on the Broomfield Property. The Bank has agreed to accept assurances of payment as adequate protection of its interests.

Concerning the Bank's claim that Brenda lacks equity in the property, the Bank's deed of trust is a third priority lien that is junior to first and second deeds of trust securing, respectively, debts of $296,334 and $37,000 payable to Wells Fargo. The Bank's total claim, after application of the life insurance proceeds, is approximately $1.1 million. That claim is secured by, among other things, the Broomfield third deed of trust that, per its terms, secures up to $175,000 in debt. Brenda values the Broomfield Property at $365,000. The Bank has demonstrated that Brenda lacks equity in the Broomfield Property. The first two liens encumber $333,334 of its value and the Bank's $175,000 lien more than consumes the rest of it.

---

[47] Dkt. 103.

The Bank also has mortgages in the Hildyard entities' real estate and security interests in their personal property. The medical buildings have values that range between their scheduled value of $500,000 and the $585,000 to which the debtor testified at trial. In addition, the Bank has an assignment of Dr. Regier's $500,000 life insurance policy. The Bank is paying the premiums on that policy. But, no one can predict when that policy might pay out and there is no actuarial evidence in the record to support such a prediction. Plus, the policy is for term insurance and only remains in force as long as the Bank pays the premiums. It has no cash surrender value. For the purpose of this Order, I conclude that its value is zero.

Summarizing, the Bank's collateral consists of its small equity position in the Broomfield Property by virtue of its third lien, its mortgages on the commercial properties valued at between $500,000 and $585,000, and Victor Hildyard's furniture, fixtures, and equipment of undetermined value, and the Regier insurance policy that has no present value.

Section § 362(d) provides that the stay may be modified or conditioned upon a finding that the Bank lacks adequate protection of its collateral, or that the debtor lacks equity in the property in question and that the property is unnecessary to an effective reorganization.[48] The creditor has the burden of proof on the question of lack of equity; the debtor has the burden on all other issues.[49] As noted above, Brenda has no equity in the Broomfield Property. But, she is planning to sell her 7th Street

---

[48] 11 U.S.C. § 362(d)(2).
[49] § 362(g).

home in Colby and intends to live in the home in Broomfield. It is necessary to her effectively reorganizing. Because she is adequately protecting the Bank's interest in the Broomfield Property as required by §362(d)(1) by maintaining debt service on the senior liens and keeping her property taxes current, there is no cause for relief from the stay under that subsection. Because she requires the home to effectively reorganize in chapter 13, the stay should not be lifted under § 362(d)(2).

Continuation of the stay in this case shall be conditioned upon Brenda maintaining current the ad valorem taxes and debt service on the senior liens owed to Wells Fargo on the Broomfield Property. The Bank shall realize upon all of its other collateral. If Brenda continues to adequately protect the Bank's interest in the Broomfield Property, the stay will remain in effect as to that property. If the Bank's claim is not satisfied in full by the liquidation of other property, the Bank may renew this motion for leave to foreclose the deed of trust on the Broomfield Property, but it shall not proceed against that property before obtaining the further order of this Court.

### *Conclusion*

Brenda's objections to Western State Bank's claim are OVERRULED and the Bank's claim is allowed. Western State Bank's motion for relief from the automatic stay is DENIED, but the continuation of the stay as to the Broomfield Property is CONDITIONED as set forth above.

The confirmation hearing on debtor's chapter 13 plan (dkt. 35) scheduled for February 12, 2014 at 1:30 is passed to **February 20, 2014 at 11:00 a.m. for a final pretrial conference on confirmation.**

###